## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KELLY ANDERSON,                              )
                                             )
            **Plaintiff,**              )   **CIVIL ACTION**
                                             )
**v.**                                       )   **No. 09-2526-KHV**
                                             )
UNITED PARCEL SERVICE, INC.,                 )
                                             )
            **Defendant.**             )
_____ )

### MEMORANDUM AND ORDER

      Kelly Anderson brings suit against United Parcel Service, Inc. ("UPS") for unlawful discrimination, retaliation and coercion, intimidation or interference under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. and wrongful discharge in retaliation for filing a workers' compensation claim under Kansas law. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #68) filed June 6, 2011. For the following reasons the Court sustains defendant's motion.

### Legal Standards

      Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

      The moving party bears the initial burden of showing the absence of any genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d

737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving

party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she

carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87

(1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving

party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

      The Court views the record in the light most favorable to the nonmoving party.  Deepwater Invs.,

Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment

if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby,

477 U.S. at 250-51.  In response to a motion for summary judgment, a party cannot rely on ignorance

of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that

something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the

inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or

whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at

251-52.

**Facts**

      The following material facts are uncontroverted, deemed admitted or, where controverted,

viewed in the light most favorable to plaintiff, the non-movant.[1]

---

      [1]      Plaintiff purports to controvert many facts in defendant's statement of uncontroverted
facts by stating that the facts are "disputed," "disputed in part" or "disputed in part and as incomplete"
even though plaintiff's response admits that she does not actually dispute the facts which defendant
sets forth.  See, e.g., Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary
(continued...)

In 1981, defendant hired plaintiff at its package center in Parsons, Kansas.  In 1985, she became a full-time package car (brown delivery truck) driver.  Pl. Depo. at 11.  As a package car driver, plaintiff picked up and delivered packages to and from customers on a bid route.  Pl. Depo. at 12.  Package car drivers lift, carry, push and pull packages of various sizes and weights (from one to 150 pounds), and load and remove them from the shelves of a package car.  Pl. Depo. at 12-13, 18-20, 78-79; Riddle Decl., ¶ 9; Williams Decl., ¶ 9.[2]  Package car drivers normally work alone on their routes.  Riddle Decl. ¶ 9; Williams Decl. ¶ 8.

Among other things, the essential functions of the package car driver position include the following: bending, stooping, crouching, squatting, climbing, standing, sitting and walking for up to 9.5 hours per day, 5 days per week; working varying shifts, additional hours and/or overtime depending on service needs; lifting, lowering, pushing, pulling, leveraging and manipulating equipment and/or

---

[1](...continued)
Judgment, Plaintiff's Response To Defendant's Statement Of Uncontroverted Facts (Doc. #79) filed July 11, 2011 ¶¶ 4, 5, 6, 13, 18, 19, 20, 22, 23, 32, 33, 44, 46-56 and 76.  Plaintiff's attempt to controvert facts in this manner is insufficient under D. Kan. Rule 56.1, which provides that all material facts set forth in the movant's statement shall be deemed admitted unless "specifically controverted" by the opposing party.  Vasquez v. Ybarra, 150 F. Supp.2d 1157, 1160 (D. Kan. 2001) (citing Gullickson v. Sw. Airlines Pilots' Ass'n, 87 F.3d 1176, 1183 (10th Cir. 1996)).  Accordingly, under D. Kan. Rule 56.1(b), the Court accepts as true defendant's factual statements which are adequately supported by record evidence.  See Williams v. Potter, 331 F. Supp.2d 1331, 1336 (D. Kan. 2004).  Plaintiff also improperly injects argument into her responses to defendant's statement of uncontroverted facts and cites portions of the record which plaintiff did not attach to her response.  The Court does not consider these portions of plaintiff's response.

[2]      Plaintiff objects to defendant's reliance on these and other declarations.  Doc. #79 ¶ 3.  She argues that the declarations are deficient and improper because they contain speculative assertions and because the declarants purport to have knowledge of other individuals, conversations, decisionmaking matters, records, job duties and events of which they do not have personal knowledge.  Rule 56(c)(4) requires that declarations used to support or oppose a motion be based on personal knowledge, set out facts that would be admissible in evidence and show that the declarant is competent to testify on the matters stated.  To the extent they do not comply with Rule 56(c), the Court does not rely on the declarations.

packages weighing up to 70 pounds; assisting in moving packages weighing up to 150 pounds; lifting packages to heights above the shoulder and lowering to foot level as appropriate; reaching, grasping, and maintaining control of items and material used to perform activities associated with delivering and picking up packages, including operation of the Delivery Information Acquisition Device ("DIAD"); maintaining an acceptable work pace; reporting to work on a regular and timely basis and completing the scheduled workday on a consistent basis.  Doc. #73, Ex. E; Toomsen Depo. at 180-81 (essential function list applies to package car driver in Kansas); Pl. Depo. 13-15, 18.

Roger Riddle has been the Parsons center manager since 2004.  Riddle Decl. ¶ 2.

### Plaintiff's Right Shoulder Injury

On February 1, 2006, plaintiff injured her right shoulder lifting packages at a customer location. Pl. Depo. at 19-20.[3]  Plaintiff reported this injury to defendant and Liberty Mutual Insurance Company, defendant's third-party administrator for workers' compensation claims, but did not request or seek medical treatment.  Id. at 19-21; Injury Investigation Summary, Doc. #73, Ex. G.  Plaintiff continued to work as a package car driver after the injury.  Pl. Depo. at 21-22.  Some time in the summer of 2006, plaintiff re-injured her right shoulder while delivering and receiving packages, but she again continued to work as a package car driver.  Id. at 33-34.[4]

In mid-November of 2006, plaintiff reported that she had re-injured her right shoulder while loading packages at a customer location.  Id. at 22-24.  When plaintiff returned to the Parsons facility that evening, she reported the re-injury to a part-time supervisor, Rebecca McClenning, and asked

---

[3]      Prior to 2006, plaintiff sustained workplace injuries, filed claims and received medical treatment for such injuries. Doc. #79, Ex. 16 (plaintiff's injury and claim history).

[4]      Plaintiff does not recall when she re-injured her shoulder or what caused it.  See Pl. Depo. at 33.

McClenning to notify Riddle. Id. at 24-25. Riddle did not report plaintiff's re-injury because he had already reported the original injury. Pl. Depo. at 26. Plaintiff did not seek or request medical treatment on the day of the re-injury. Id. at 22-27.[5]

The next day, Riddle took plaintiff into his office and accused her of falsifying an injury because she was unhappy with her hours and did not want to work through Christmas. Id. at 27-28. Riddle raised his voice and was very angry. Id. In response, plaintiff said, "Fine, send me to a doctor." Id. at 30. Defendant subsequently scheduled an appointment for plaintiff with Dr. Arun Sharma. Id. On November 16, 2006, plaintiff saw Dr. Sharma. Doc. #76, Ex. H. Plaintiff told Dr. Sharma that she did a lot of repetitive lifting in her job and was having significant pain in her right shoulder. Doc. #76, Ex. H; Pl. Depo. at 36. Dr. Sharma gave plaintiff the following medical restrictions, "No over shoulder lifting or pushing and pulling," and scheduled an MRI. Doc. #76, Ex. I. Defendant then assigned plaintiff to temporary alternate work ("TAW") at the Parsons center. Toomsen Depo. 83-84, 89; Riddle Decl. ¶ 20; see also Pl. Depo. at 38; Doc. #73, Ex. J (e-mail regarding plaintiff's restrictions and TAW assignment).

While on TAW, Riddle made plaintiff work nights and pick up trash in the parking lot. Pl. Depo. at 50. Plaintiff had not worked nights before, and she confronted Riddle about why she had to work nights while on TAW. Id. Riddle became angry and stated, "I can make you do whatever I want to." Id.

---

[5]    It is not clear whether defendant reported this re-injury to Liberty Mutual. Plaintiff testified that Riddle did not want to report the injury because defendant had already reported it. Based on the declarations of Gayle Ferguson, Brad Williams and Riddle, defendant asserts that defendant did report plaintiff's re-injury. Doc. #73, Exs. B, C, D. It is not clear from the declarations whether any of the declarants had firsthand knowledge whether defendant reported plaintiff's re-injury to Liberty Mutual.

On November 20, 2006, an MRI revealed that plaintiff had a torn right rotator cuff. Diagnostic Imaging Report, Doc. #76, Exs. K and M; see Pl. Depo. at 37. On November 27, 2006, Dr. Sharma examined plaintiff. See Doc. #76, Ex. L. Plaintiff stated that she wanted to return to work. Id., Ex. M. Dr. Sharma noted that plaintiff was able to perform duties as a package car driver through peak season with the following restrictions: "needs automatic drive vehicle and use left arm for overhead use and Rt arm for support only until 12-22-06." Id., Ex. L; see id., Ex. M.

From late November of 2006 to late December of 2006, plaintiff returned to work as a package car driver. Riddle Decl. ¶ 25; see Pl. Depo. 48-49.[6] During this time, defendant gave her a load stand which she could stand on to reduce the amount of over shoulder and overhead lifting. Riddle Decl. ¶ 26. It also instructed the loaders to put heavier packages on the bottom shelves of her package car. Id.

On December 28, 2006, plaintiff saw a surgeon, Dr. Brad Meister. See Doc. #76, Ex. N; see Pl. Depo. at 52-53. On January 5, 2007, Dr. Meister performed surgery to repair plaintiff's right rotator cuff. Id., Ex. O; see Pl. Depo. at 53. On January 18, 2007, Dr. Meister gave plaintiff medical restrictions which stated as follows: "no use R arm x 6-8 wks." Doc. #76, Ex. P. Dr. Meister subsequently extended the restrictions through March of 2007. Id., Exs. P, Q and R. On March 26, 2007, Dr. Meister stated that plaintiff should remain "off work." Id. Ex. S.

In April of 2007, plaintiff had an MRI which revealed a new tear in her right shoulder. Doc. #76, Ex. U. On May 8, 2007, Dr. Lowry Jones gave plaintiff the following work restrictions: "light duty" and "no use of [right] arm at all." Id., Ex. V. Plaintiff was unable to move her right shoulder, and Dr. Jones diagnosed her with a "frozen shoulder." See Pl. Depo. at 57; Doc. #76, Ex. W (Dr. Jones

---

[6]     Plaintiff worked as a package car driver for at least 18 days after she re-injured her shoulder in November of 2006. Pl. Depo. at 34-35, 46-48.

Operative Report).  On May 23, 2007, Dr. Jones performed a second surgery on plaintiff's right shoulder.  Pl. Depo. at 56; <u>see</u> Doc. #76, Ex. W.

Between June and August of 2007, plaintiff attended physical therapy and had restrictions on the use of her right shoulder and arm, including no repetitive lifting above her right shoulder, no lifting greater than five or ten pounds to chest and no reaching, pushing or pulling with her right arm. Doc. #76, Ex. X (June 4, 2007 and July 9, 2007 workers' compensation return to work status sheet). In August of 2007, Dr. Jones imposed restrictions of "20-pound lifting to the chest, no repetitive lifting, overhead."  He also recommended a functional capacity evaluation ("FCE") and spoke with plaintiff about a possible third surgery.  <u>Id.</u>, Ex. Y.

On September 18, 2007, plaintiff had an FCE.  <u>Id.</u>, Ex. Z (FCE report).  The FCE concluded that based on the essential job functions for plaintiff's package car driver job, "she would not be able to return to full duty work" because she would not be able to meet the requirement of lifting, pushing and pulling 70 pounds.  <u>Id.</u> at 2.  In October of 2007, Dr. Jones concluded that plaintiff had reached maximum medical improvement and imposed permanent medical restrictions as follows: no repetitive lifting above her right shoulder, maximum lifting 45 pounds floor to knuckle, 25 pounds knuckle to shoulder and overhead, pushing capacity of 35 pounds and pulling capacity of 45 pounds.  Doc. #76, Ex. AA.  Since 2007, no healthcare provider has released plaintiff to perform the essential functions of her package car driver job.  Pl. Depo. at 63-64.

### Harassment

Plaintiff testified that Riddle harassed her after she filed her injury report.  He accused plaintiff of falsifying an injury to avoid working during the holidays, Pl. Depo. at 41; scheduled plaintiff's TAW at night and required her to pick up trash, <u>id.</u> at 270; and hung plaintiff's picture on a board titled "Those

Whose Help I Need" (a.k.a. the "wall of shame") after plaintiff filed an injury report, id. at 274, 301. In addition, plaintiff testified that defendant harassed her by not allowing her to return to work and by investigating her for stealing shipping supplies.  Id. at 285-86.

### Plaintiff's Application For Social Security Disability Benefits

Plaintiff received workers' compensation payments through October 1, 2007. Doc. #76, Ex. BB. Liberty Mutual contacted plaintiff twice to settle her workers' compensation claims but she refused. Pl. Depo. at 249-50.  In November of 2007, plaintiff applied for social security disability benefits.  Id. In her application, plaintiff sated that she became unable to work because of her "disabling condition on February 1, 2006," i.e. her right shoulder injury. Id. at 1; Pl. Depo. at 68.  Plaintiff testified that she had limited movement in her shoulder, difficulty raising her arm and inability to use her hand, which worsened after her surgery in January of 2007 and persisted through her deposition in September of 2010.  Pl. Depo. at 54-55, 58, 71, 74-75, 82-87, 91-92, 94, 97-98, 100-09.

Based on information which she provided, the Social Security Administration ("SSA") completed a disability report for plaintiff.  Doc. #73, Ex. CC; see Pl. Depo. at 72.  In response to Question A in Section 2, "What are the illnesses, injuries, or conditions that limit your ability to work?", plaintiff responded, "Frozen shoulder, re-torn rotator cuff, non repairable." Doc. #73, Ex. CC at 2.  In response to Question B in Section 2, "How do your illnesses, injuries, or conditions limit your ability to work?", plaintiff responded, "I am not able to move the whole right side of my upper body.  It affects all aspects of my life, and most of all I am not able to work due to the limited mobility and constant pain I am in."  Id. at 2; Pl. Depo. at 73-75.

On November 15, 2007, plaintiff completed an SSA function report which stated that her shoulder injury limited her ability to perform daily activities such as dressing, bathing, hair care, eating

and using the toilet.  Doc. #73, Ex. DD; <u>see</u> Pl. Depo. at 80-88.  Plaintiff wrote that she had to use her left hand to perform daily tasks and "cannot tuck shirts in, put on a belt, zip a coat, Button a shirt with right arm."  Doc. #73, Ex. DD at 2.  Plaintiff testified that she had to perform these tasks left-handed because her right arm and hand did not work after her surgery in January of 2007.  Pl. Depo. at 80-88.

The function report also stated that plaintiff had difficulty performing or could not perform a wide variety of daily activities including cooking, house work, yard work, driving, shopping and laundry.  Doc. #73, Ex. DD.  For example, plaintiff responded to question 14.c as follows: "Husband and daughter do sweeping, mopping, carrying and putting up laundry or chores that require pushing, pulling, lifting." <u>Id.</u> at 3.  Under Question 16, titled "Shopping," plaintiff stated that she went shopping with her husband and daughter so they could carry packages because she could not carry items or push the cart. <u>Id.</u> at 4.  In the section titled "Information About Abilities," plaintiff indicated that her shoulder injury affected the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration and using hands.

Specifically, plaintiff wrote, "I have very limited mobility in my shoulder.  I cannot reach." <u>Id.</u> at 6.  In the section titled "Remarks" plaintiff explained the limitations imposed by her injury as follows:

> Before I was able to do anything – now I have to rely on others.  The simplest things are impossible for me to do.  Such as getting clothes out of washer or back of dryer.  Folding big items such as towels or jeans is now a 4 step process.  I cannot open jars or take lids off.  I cannot get or put dishes up in a cabinet.  I cannot take anything heavy out of oven.  I cannot shift a vehicle that shifts on the column . . . .  I cannot pull, start or push a mower.  I have to use my left hand for everything.  My pain is not only the shoulder but affects my whole right side to my waist . . . .  My right ribs feel as if they are stabbing into me at all times.  There is not a day that goes by that I do not hurt.  I have very limited mobility on my right side.

<u>Id.</u> at 8.  Plaintiff's deposition testimony confirmed her responses to the SSA questionnaires.  Pl. Depo. at 73-88.

Specifically, plaintiff testified that since January of 2007, she has not been able to (1) lift or lower packages weighing up to 70 pounds using her right shoulder or arm, (2) lower packages or other items with any weight to the floor using her right hand, (3) reach, grasp and maintain control of items with her right hand or (4) work eight hours a day, five days a week.  Id. at 105, 108-09.  Plaintiff testified that the limited mobility on her right side and related impairments began in January 2007 and continued through September of 2010.  Id. at 81-90, 104, 112.

In support of plaintiff's application for social security disability benefits, plaintiff's husband Charles Anderson completed a third-party function report which echoed plaintiff's report and deposition testimony.  Doc. #73, Ex. EE.

In December of 2007, the SSA denied plaintiff's application.  Doc. #76, Ex. GG.  In early 2008, plaintiff asked the SSA to reconsider her application.  Id., Ex. HH.  Plaintiff testified that at the time the SSA denied her application she believed she was disabled and unable to work.  Pl. Depo. at 113.  In February of 2008, plaintiff told Dr. Stanley Mintz that she needed help dressing, bathing, washing her hair, tying her shoes and pulling up her pants, and that her family members essentially did all of her activities of daily living.  Doc. #76, Ex. II; Pl. Depo. at 153-55.  Plaintiff also told Dr. Mintz that she had a "frozen shoulder" which was beyond repair and that the doctors had not released her to return to work.  Doc. #76, Ex. II; Pl. Depo. at 155.[7]

On March 20, 2008, the SSA affirmed its denial of plaintiff's claim for disability benefits.  Doc. #76, Ex. JJ.  Plaintiff testified that she disagreed with SSA finding that her condition was not

---

[7]    Plaintiff argues that defendant relies on hearsay evidence to establish this fact.  Plaintiff's statements to Dr. Mintz are not hearsay because they are statements by a party opponent, Fed. R. Evid. 801(d)(2), and Dr. Mintz's notes are admissible because plaintiff stipulated that plaintiff's medical records are business records under Rule 803(6) Fed. R. Evid., and may be introduced without further foundation, Pretrial Order (Doc. #66) filed May 26, 2011 at 2.

severe enough to keep her from working and she filed an appeal in March of 2008.  Pl. Depo. at 114;

Doc. #73, Ex. KK.  Plaintiff submitted a disability report with an appeal which reiterated the impact of

her right should injury on her life.  Plaintiff summarized her condition as follows:

> My condition continues to go down hill daily.  I hurt all the time from my head to my hip
> on the right side,. [sic]  This affects my vision my ability to think clearly writing is also
> very hard.  The simplist [sic] tasks are very difficult such as dressing after I get dressed
> with help the I [sic] have to lay down until the pain subsides. I take daily pain meds
> many days I just do not get out of bed I just hurt all the time.  The pain affects my right
> side my right eye feels as if it is turned towards my nose and also feels like it is falling
> out.  My head feels very fuzzy all the time.  I make no decisions on my own I no longer
> drive as I feel it is not safe with the lighthead feeling.  I am very depressed as my
> situation to me appears "hopeless" the pain which is very intent [sic] never goes away.
> . . .  My mind constantly feels very foggy as the pain over take [sic] normal thoughts .
> . . . [O]n a scale of 1 to 10 my pain [] is a 8 or 9 daily never goes away therefore I have
> no desire or ability to complete normal daily tasks.  My right hand feels asleep all the
> time and is very cold.  Pain radiated from shoulder to tips of my fingers as well as on the
> underside of my arm. T[i]p of shoulder is numb at all times, I can not [sic] sleep at night.
> . . .  No comfortable position sitting in a chair makes my arm and shoulder numb,
> standing makes my back side and head hurt, seems as if my whole sketal [sic] system has
> shrunk in have a severe stabbing pain in my left ribs.  Hard to pick up and hold things
> with right hand.

Doc. #73, Ex. KK at 6.  Again, plaintiff testified that these problems with her right arm started after her

surgery in January of 2007 and continued through September of 2010.  Pl. Depo. at 128-34, 142.

In October of 2008, Dr. Bernard Poole performed an independent medical examination of

plaintiff and concluded that she was "unfit for work that requires at-arm's-reach or overhead work of

any kind."  Doc. #76, Ex. MM; see Pl. Depo. at 205-06.  He also stated as follows: "I think that work

at waist level such as bench or machine work not involving lifting of over 10 pounds on a repetitive

basis is within this patient's abilities.  I do not think that this patient can return to her previous work as

a UPS driver."  Doc. #76, Ex. MM; see Pl. Depo. at 205-06.

After a hearing in September of 2009, the SSA reversed its decision and found that plaintiff was

disabled and unable to work full time.  Doc. #76, Ex. NN.[8]

### Plaintiff's Request For Accommodation

In early 2008, plaintiff requested an accommodation for her medical condition so that she could return to work.  Pl. Depo. at 149.[9]  Defendant and the Teamsters Union Local 795 which represented plaintiff agreed that plaintiff would go through defendant's ADA accommodation process.  See Doc. #73, Ex. RR; Ferguson Decl. ¶ 31.  In early February of 2008, defendant sent plaintiff paperwork to begin the ADA accommodation process.  Doc. #73, Ex. SS.[10]

In February of 2008, Dr. Lowry Jones completed a "Request for Medical Information" form and returned it to defendant.  Doc. #76, Ex. UU.  On the form, Dr. Jones indicated that plaintiff was not able to perform all of the functions of her job.  Id.  He also stated as follows: "No repetitive overhead work to include pushing, pulling or lifting w/RT upper extremity."  Id. at 1.  For several questions, Dr. Jones responded "See dictation attached 10-1-07," concerning plaintiff's permanent restrictions.  Id. at 2.  In response to Question 6, which asked whether plaintiff's condition substantially limited her major life

---

[8]     Plaintiff argues that her application for social security disability insurance does not inherently contradict her ADA claims and that she is not judicially estopped from making claims that are inconsistent with prior representations to the SSA.  Defendant does not argue that plaintiff is judicially estopped from disclaiming her representations to the SSA, but simply argues that plaintiff's statements to the SSA are evidence of plaintiff's injury and the extent of her disability.

[9]     Plaintiff testified that in 2006, she spoke with Audra Robinson in defendant's human resources department about an ADA information packet which plaintiff never received.  Pl. Depo. at 168-69.  Robinson's predecessor, Monica Sloan, was supposed to send plaintiff information regarding jobs for which plaintiff "could potentially be qualified."  Pl. Depo. at 169.

[10]     Plaintiff objects that defendant relies solely on hearsay evidence to establish that defendant sent plaintiff information regarding the accommodation process; however, plaintiff has stipulated that all documents produced by defendants that were generated by defendant's employees or agents are business records under Rule 803(6), Fed. R. Evid.  Moreover, plaintiff testified to receiving the letter. Pl. Depo. at 192-93.

activities other than working, Dr. Jones checked "no" and wrote "NA".  Id. at 3.[11]

Jan Toomsen, defendant's West Region Occupational Health Manager, and Fran Folino, West Region Workforce Planning Manager, reviewed plaintiff's request for accommodation, her 2007 permanent restrictions, her FCE report and the Request for Medical Information completed by Dr. Jones. Toomsen Depo. at 191-92; see Folino Decl. ¶ 25.  Based on the medical information, Toomsen and Folino concluded that plaintiff did not have a "disability" as defined by the ADA prior to the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, effective January 1, 2009. Doc. #73, Ex. WW.  By letter dated March 13, 2008, defendant advised plaintiff that it was unable to conclude that she was disabled within the meaning of the ADA.  Doc. #73, Ex. XX.  Accordingly, it found that plaintiff was "not eligible for a reasonable accommodation under applicable law."  Id.

Plaintiff remembered Riddle telling her that employees with restrictions were not allowed to return to work.  Pl. Depo. at 202.  She also testified that defendant had a policy that prohibited employees from returning to work unless they had received a 100 per cent release.  Id. at 297-98. Plaintiff, however, had no personal knowledge of such policy.  Id.

### Plaintiff's Request For Reconsideration Of Request For Accommodation

On January 8, 2009, plaintiff received a form letter from defendant's human resources manager, Gary Liberti, addressed to "UPSers" regarding management and sales opportunities at UPS.  Doc. #79, Ex. 10.  That month, plaintiff asked defendant to reconsider her request for accommodation.  Doc. #73, Ex. YY.  In February of 2009, defendant sent plaintiff the ADA paperwork and reconsidered her request

---

[11]     Plaintiff objects that defendant relies solely on hearsay evidence to establish Dr. Lowry's responses to the request for medical information.  Defendant does not offer Dr. Jones' responses for the truth of the matter asserted (i.e. the veracity of his medical diagnosis).  Rather, defendant offers his responses to show what information defendants' descisionmakers relied on in determining whether plaintiff was disabled under the ADA.

for an accommodation.  Id., Ex. ZZ.  In March of 2009, plaintiff's healthcare provider, M. Cathy Swearingen, Advanced Registered Nurse Practitioner, completed the "Request for Medical Information" form.  Doc. #76, Ex. AAA.  Swearingen stated that plaintiff was unable to lift overhead and could not "reach grasp lift."  Id. at 1.  She indicated that plaintiff was unable to perform all of the functions of her position.  Id.  Swearingen stated that plaintiff was unable to raise her right arm over her head, handle wight due to weakness or lift 40 pounds repeatedly.  She also stated that plaintiff had difficulty controlling the use of her right arm and using her right arm in dressing/combing her hair.  Id. at 3. Swearingen indicated that plaintiff's condition substantially limited her ability to perform major life activities.  Id. at 2.[12]

Toomsen and Folino reviewed plaintiff's request for reconsideration, the medical information which they had reviewed in 2008, and the Request for Medical Information completed by Swearingen. See Folino Decl. ¶ 31.  Due to the expanded definition of "disability" under the ADA Amendments Act, Pub. L. No. 110-325, 122 Stat. 3553, and additional information in the 2009 Request for Medical Information, Toomsen and Folino believed that plaintiff might have a "disability" under the ADA as amended.  Doc. #73, Ex. BBB; Folino Decl. ¶ 32.  Accordingly, in April of 2009, Toomsen instructed defendant's District Human Resources representatives to meet with plaintiff to discuss her request for accommodation.  Doc. #73, Ex. BBB.

On April 30, 2009, defendant advised plaintiff of the meeting and asked her to be prepared to discuss the accommodation which she was seeking.  Doc. #73, Ex. CCC.  On May 4, 2009, Kansas

---

[12]     Plaintiff objects that defendant relies solely on hearsay evidence to establish Swearingen's responses to the request for medical information.  Defendant does not offer Dr. Jones' responses for the truth of the matter asserted (i.e. the veracity of her medical diagnosis).  Rather, defendant offers his responses to show what information defendants' descisionmakers relied on in determining whether plaintiff was disabled under the ADA.

District Workforce Planning Manager Gayle Ferguson, District Occupational Health Supervisor Jurgen Rosner, and Employee Relations Manager Brad Williams traveled to the Parsons, Kansas facility to meet with plaintiff about her request.  Id.; Ferguson Decl., ¶ 43; Williams Decl., ¶ 39; Rosner Decl. ¶ 40. Plaintiff testified that two others attended the meeting, but she does not remember who they were.  Pl. Depo. at 190.

During the hour-long meeting on May 4, plaintiff filled out the first page of defendant's "Accommodation Checklist."  Doc. #73, Ex. DDD.  Defendant did not assist plaintiff in filling out the form and did not answer questions which plaintiff had about the form.  Pl. Depo. at 225-30.  Under "Self Identified Condition," plaintiff wrote "thorasic [sic] outlet, right torn rotator cuff, right nerve damage, right loss motion and rotation, left shoulder issues."  Id. at 1.  Under "Current Limitations in Position as a Result of Self-Identified Condition," plaintiff wrote "Limited use of right shoulder – side – limited use of left shoulder and both arms and hands."  Id.  Plaintiff also indicated that she had "issues with neck and head – concentrating."  Id.

On the accommodation checklist form, and during the meeting on May 4, 2009, plaintiff did not request a specific accommodation or reassignment to a particular job.  Ferguson Decl. ¶ 45; Williams Decl. ¶ 40; Rosner Decl. ¶ 42; Toomsen Dep. 72-73; see Doc. #73, Ex. DDD.  Plaintiff did not state that she could perform the package car job or that she wanted to return to that position.  Instead, she requested that defendant allow her to "return to work – within [her] capabilities as pursuant to [her] restrictions."  Doc. #73, Ex. DDD.

Plaintiff testified that defendant tried to intimidate her at the checklist meeting by having five representatives, holding the meeting in a small room and not letting her lawyer or union representative attend.  Pl. Depo. at 226, 234.  Plaintiff also testified that Ferguson tried to intimidate her by telling her

-15-

to "be very careful about what you write" on the accommodation checklist. Id. at 216.  Plaintiff also complains that defendant did not pay her for the hour-long meeting.  Id. at 226.

After the meeting, Toomsen and Folino reviewed the medical documentation and the information from plaintiff and Ferguson.  They concluded that defendant was unable to identify a reasonable accommodation that would allow plaintiff to perform her package car job.  Toomsen Depo. at 71-72.  They also could not identify any available position at the Parsons facility for which plaintiff could perform the essential functions with or without reasonable accommodation.  Toomsen Depo. at 66-69.  On June 22, 2009, Toomsen instructed Rosner to advise plaintiff that defendant believed she was not a qualified individual with a disability under the ADA.  Doc. #73, Ex. GGG.

On June 23, 2009, Rosner sent plaintiff a letter which stated that defendant was unable to conclude she was disabled under the ADA.  Id., Ex. HHH.  On February 8, 2011 (nearly one and a half years after plaintiff filed this suit), Ferguson sent plaintiff a letter which stated that defendant had sent plaintiff the wrong letter on June 23, 2009.  Id., Ex. III at 1.  Ferguson attached a revised letter which stated that "after carefully reviewing your situation, we are not aware of any available position at UPS . . . for which you are qualified and capable of performing the essential functions with or without reasonable accommodation."  Id. at 2.

Since 2007, plaintiff has not advised defendant of any open positions at the Parsons facility for which she could perform all essential functions with or without reasonable accommodation.  Ferguson Decl. ¶ 55; Williams Decl. ¶ 54; Rosner Decl. ¶ 53.  Plaintiff thought that she could be a clerk or unload package cars with assistance, but she did not know the essential functions for these positions.  Pl. Depo. at 186.  Plaintiff has not returned to work since December of 2006, and defendant has not paid her since

-16-

that time.  Pl. Depo. at 249.[13]  Plaintiff has consistently maintained that she wanted to return to work as a package car driver or any job consistent with her restrictions.  Pl. Depo. at 149,  180.

Since January of 2007, Riddle may have helped determine what jobs were available at the Parsons plant, but he has not made any decisions about whether plaintiff could return to work, her request for accommodation or her request for reconsideration.  Riddle Decl. ¶ 40-45; Doc. #73, Ex. F at 196-97.

In 2009, Dr. Jones diagnosed plaintiff with left shoulder impingement due to a tear in that shoulder.  Doc. #76, Ex. JJJ.  On April 30, 2010, Dr. Jones performed surgery on plaintiff's left shoulder, and imposed permanent medical restrictions on plaintiff on that shoulder.  Id.

### Defendant's Accommodations Policy

Prior to November of 2006, plaintiff reported several work-related injuries, filed workers' compensation claims and continued to work as a package car driver at UPS.  Riddle Decl. ¶ 64; see Pl. Depo. at 275-76.  Since 2004, numerous employees at defendant's facility in Parsons, Kansas, including plaintiff, have returned to work after suffering work-related injuries and filing workers' compensation claims.  Riddle Decl. ¶ 51; Rosner Decl. ¶ 61; Ferguson Decl. ¶ 64; Williams Decl. ¶ 56. Plaintiff asserts, however, that defendant maintains a "100% healed" policy which is relevant to defendant's motivation for refusing to let her return to work and whether it regarded plaintiff as disabled.

### Theft Of Shipping Supplies

In August of 2009, part-time supervisor Rebecca McClenning notified Center Supervisor

---

[13]     Plaintiff clocked in for one hour at some point after December of 2006 so that she could continue to accrue pension benefits, but she did not perform any work.  Pl. Depo. at 169-70.

Stephanie Cunningham that plaintiff had come to the center and taken packing tape while on leave. McDaniel Depo. at 20. Defendant's Loss Prevention Department investigated McClenning's report, but the evidence was inconclusive. McDaniel Depo. 16-21. Defendant did not discipline plaintiff as a result of the report or its investigation and it has never terminated plaintiff's employment. Id.; Pl. Depo. at 276.

### Analysis

As noted above, plaintiff brings claims for unlawful discrimination, retaliation and coercion, intimidation or interference under the ADA. She also brings a claim for wrongful discharge in retaliation for filing a workers' compensation claim under Kansas law. The Court reviews plaintiff's claims under the familiar analytical framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997); Williams v. Widnall, 79 F.3d 1003, 1005 & n.3 (10th Cir.1996); Rebarchek v. Farmers Co-op Elevator, 272 Kan. 546, 552-53, 35 P.3d 892, 898 (2001) (applying McDonnell Douglas framework to workers' compensation retaliation claim).[14]

In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case for each claim. Morgan, 108 F.3d at 1323. If plaintiff does so, the burden shifts to defendant to offer a legitimate nondiscriminatory reason for its employment decision. Id. If the employer comes forward with a nondiscriminatory reason for its actions, the burden reverts to plaintiff to show by specific facts "a genuine dispute of material fact as to whether the

---

[14]     The McDonnell Douglas burden-shifting analysis is appropriate in disability discrimination cases like this in which plaintiff has no direct evidence of discrimination and the employer disclaims reliance on the plaintiff's disability for an employment decision. Morgan, 108 F.3d at 1323 n.3.

employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." Id. Demonstrating pretext gets plaintiff "over the hurdle of summary judgment." Id.

Plaintiff can show pretext by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Id

## I.     ADA Discrimination Claim

The pretrial order sets forth two discrimination claims under the ADA. First, plaintiff claims that defendant discriminated against her because of her disability by not letting her return to her package car driver job. Second, she claims that defendant failed to accommodate her disability by refusing to reassign her to a vacant position pursuant to Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999).

### A.     Package Car Driver Position

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, plaintiff must show that (1) she has a "disability" under the ADA, (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation and (3) defendant terminated her employment under circumstances which give rise to an inference that the termination was based on her disability. Morgan, 108 F.3d at 1323. A "qualified individual" is a person with who can perform the essential functions of the employment position that she holds or desires, with or without reasonable accommodation.

-19-

42 U.S.C. § 12111(8).

Defendant argues that plaintiff has not raised a genuine issue of material fact with respect to the second and third elements. The Court therefore assumes that plaintiff has a disability within the meaning of the ADA, and turns to whether plaintiff could perform the essential functions of her package car driver position with or without accommodation. This involves a two-part inquiry. Mason v. Avaya Commc'n, Inc., 357 F.3d 1114, 1117 (10th Cir. 2004). First, the Court must determine whether plaintiff can perform the essential functions of the job. Id. Second, if the Court concludes that plaintiff is not able to perform the essential functions of the job, it must determine whether any reasonable accommodation could enable her to perform those functions. Id.

Plaintiff admits that since her surgery in January of 2007, she has been unable to perform the essential functions of the package car driver position without accommodation;[15] therefore the question is whether she could have performed those functions with reasonable accommodation.[16] Mason, 357

---

[15]    At plaintiff's deposition, defense counsel asked plaintiff how the limitations due to her shoulder injuries limited her ability to perform the package car driver job. Pl. Depo. at 224. Plaintiff responded as follows: "Well, if I had limited use of the right shoulder and the right side and limited use of the left shoulder, how could – without accommodations, how could I perform the essential functions of a package car driver job?" Id. at 224-25; see also id. at 186 ("I do not know of any jobs that could be performed without accommodations for my medical restrictions.").

    Moreover, the record clearly reflects that without accommodation plaintiff could not have performed the essential functions of the package car driver job, which included the ability to "[l]ift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds." Doc. #73, Ex. E. Plaintiff does not dispute that these are among the essential functions for the job. Doc. #79 at 7. The memorandum in support of defendant's motion for summary judgment provides a thorough summary of the extensive record on plaintiff's inability to perform these functions. Doc. #69 at 25-28.

[16]    "Reasonable accommodation" includes making existing facilities used by employees readily accessible to and usable by individuals with disabilities, job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, and

(continued...)

F.3d at 1117; Manning v. Gen. Motors, 529 F. Supp.2d 1282, 1289 (D. Kan. 2008).  Defendant maintains that no reasonable accommodation would have enabled plaintiff to perform the package car driver position.  Plaintiff never requested a specific accommodation and has not identified an accommodation that would have permitted her to perform the package car driver job.[17]  See Pl. Depo. at 219-20, 224-25.

For plaintiff to perform the package car driver position, given her shoulder injury and the restrictions imposed by her doctors, defendant would have had to redefine the position.[18]  Although job restructuring is a possible accommodation under the ADA, "[a]n accommodation that eliminates the essential function of the job is not reasonable."  Frazier v. Simmons, 254 F.3d 1247, 1261 (10th Cir. 2001).  Accordingly, plaintiff has not shown a genuine issue of material fact whether she was qualified to perform her package car driver job with or without accommodation.  The Court therefore sustains defendant's motion for summary judgment on plaintiff's first disability discrimination claim.

**B.    Reassignment**

Plaintiff claims that defendant should have accommodated her restrictions by assigning her to a vacant position.  In Midland Brake, the Tenth Circuit laid out the burden-shifting framework which applies to such claims.  180 F.3d at 1179.  Plaintiff must make an initial showing that: (1) she is a

---

[16](...continued)
other similar accommodations for individuals with disabilities.  42 U.S.C. § 12111(9).

[17]    Plaintiff asked defendant to "accommodate doctors restrictions – according to files and papers with respect to right & left shoulder injuries" and to allow her to "return to work – within my capabilities pursuant to the restrictions I have."  Doc. #73, Ex. DDD.  She also asked for "whatever [accommodation] the ADA would allow me to have."  Pl. Depo. at 219.

[18]    Compare Doc. #76, Exs. I, L, M, P-S, V, X, Y, AA (restrictions ranging from no use of right arm to lifting restrictions below 70 pounds) with Doc. #73, Ex. E (essential functions of package car driver job including lifting, lowering, pushing, pulling up to 70 pounds); see also Pl. Depo. at 63-64 (no physician released plaintiff to perform essential functions of her job).

disabled person within the meaning of the ADA and has notified defendant of any limitations that result

from her disability; (2) defendant cannot reasonably accommodate plaintiff within her existing job; (3)

plaintiff asked defendant to reasonably accommodate her disability by reassignment to a vacant position,

which plaintiff may identify or may ask defendant to identify through an interactive process; (4) with

or without reasonable accommodation, plaintiff was qualified to perform one or more appropriate vacant

jobs within the company; at the time of the summary judgment proceeding, plaintiff must specifically

identify vacant jobs which were available at or about the time she requested reassignment. Also,

plaintiff must show that she suffered injury because defendant did not offer to reassign her to any

appropriate vacant position. Id.

Defendant does not contest that plaintiff was disabled and that she notified defendant of her

limitations due to the disability. With respect to the third element, i.e. reasonable accommodation by

reassignment, plaintiff argues that defendant violated the ADA by not engaging in good faith in an

interactive process to find an alternative position for her.

In 2009, defendant gathered information from plaintiff and her medical provider regarding

plaintiff's medical conditions and limitations. See Doc. #73, Ex. ZZ; Doc. #76, AAA; Pl. Depo. at 208-

09. On May 4, 2009, at least three of defendant's human resource representatives traveled to Parsons

to meet with plaintiff about her request for accommodation. Doc. #73, Ex. CCC; Ferguson Decl. ¶ 43;

Williams Decl. ¶ 39; Rosner Decl. ¶ 40; see Pl. Depo. at 227. At the meeting, the representatives asked

plaintiff to fill out an accommodation checklist. Pl. Depo. at 213-14. On the checklist, plaintiff

described her position, condition and desired accommodations with respect to her current and other

positions. Doc. #73, Ex. DDD. With respect to accommodations, plaintiff stated that she wanted

defendant to accommodate her medical restrictions and that she wanted to return to work within her

capabilities pursuant to her restrictions.  Id.

Ferguson, defendant's District Occupational Health Supervisor, filled out the last two pages of the form regarding whether defendant had the means to accommodate plaintiff in her current position or any other available position.  Id.  Ferguson stated that defendant could not accommodate plaintiff in her current position and that no current or reasonably foreseeable openings existed.  Id.  Plaintiff offers no evidence to controvert these findings.[19]

Plaintiff testified that defendant tried to intimidate her at the checklist meeting by sending five representatives, holding the meeting in a small room and not letting her lawyer or union representative attend; that Ferguson tried to intimidate her by telling her to "be very careful about what you write" on the accommodation checklist; and that defendant refused to pay her for the one-hour meeting.  Pl. Depo. at 216, 226, 234.  This testimony, however, does not raise a genuine issue of material fact whether defendant attempted to subvert the interactive process, engaged in the process in bad faith or otherwise caused a breakdown in the process.

Even if defendant did not fulfill its interactive obligations to help secure an alternative position, plaintiff cannot survive summary judgment unless a reasonable accommodation was possible and would have led to a reassignment.  Midland Brake, 180 F.3d at 1174.  Plaintiff must specifically identify one or more vacant jobs which she was qualified to perform with or without accommodation at or about the

---

[19]     On June 23, 2009, Rosner sent plaintiff a letter which stated that defendant could not determine that plaintiff was disabled under the ADA, and therefore she was ineligible for a reasonable accommodation.  As discussed in detail below, the record reflects that Rosner accidentally sent the wrong form letter and that the letter did not reflect Toomsen's actual decision that plaintiff was not a qualified individual with a disability because plaintiff could not perform the essential functions of her job or any job at the Parsons facility with or without reasonable accommodation.  The erroneous letter does not create a genuine issue of material fact whether Toomsen and Folino did not attempt to ascertain whether a reasonable accommodation existed which would have allowed plaintiff to return to work.

time she requested reassignment.  Id. at 1179.  She has not done so.  Plaintiff has not identified a single

vacant job that she was qualified to perform, with or without accommodation, at or about the time that

she requested reassignment.[20]  Plaintiff testified that in 2007 she probably could have been a clerk or

unloaded package cars with assistance.  Pl. Depo. at 186.  She also testified that to her knowledge, no

clerk positions were open in 2007 and she had no idea whether any unloader positions were open at that

time.  Id. at 186-88.  Plaintiff stated that she was unaware of the essential job functions for the clerk and

unloader positions and she did not know whether she could have performed either position with or

without accommodation.  Id.  Plaintiff has not specifically identified an alternative position that was

available within the company at or about the time she requested reassignment.  Accordingly, plaintiff

has not established a prima facie case of disability discrimination for failure to accommodate by offering

reassignment, and the Court sustains defendant's motion for summary judgment on this claim.[21]

---

[20]      Citing Third Circuit case law, plaintiff argues that an employee does not have the
burden of identifying open positions without the employer's assistance.  Doc. #79 at 38 n.5.  The Tenth
Circuit has noted that employers are required to engage in the interactive process in good faith.
Midland Brake, 180 F.3d at 1172.  These cases refer to the employer's involvement in the interactive
process to find a reasonable accommodation for the employee; they do not refer to an employer's
burden during litigation.  At the summary judgment stage of litigation, the Tenth Circuit has clearly
held that the employee must identify one or more appropriate vacant jobs which she was qualified to
perform, with or without accommodation, at or about the time she requested reassignment.  Id. at 1179.

[21]      Plaintiff raises the specter of defendant's alleged "100% rule" or "100%-healed policy,"
i.e. a corporate policy under which defendant required an employee to free from all medical restrictions
before returning to work.  Evidence of such a policy is potentially relevant to the unlawful motivation
behind defendant's refusal to return plaintiff to work or whether defendant considered defendant to
be disabled.  Jones v. United Parcel Service, Inc., 502 F.3d 1176, 1188-89, 1193 (10th Cir. 2007).  It
is not relevant to the fourth element of plaintiff's prima facie case, i.e. whether plaintiff has specifically
identified a vacant job which she could have performed with or without accommodation.  The Court
expresses no opinion with respect to whether any particular piece of evidence regarding defendant's
"100%-healed policy" is admissible.

## II.     ADA Retaliation And Interference Claims

Plaintiff claims that in violation of 42 U.S.C. § 12203(a), defendant retaliated against her for requesting an accommodation.  She also claims that in violation of 42 U.S.C. § 12203(b), defendant interfered with her right to return to work with accommodation.  Plaintiff correctly notes that the statute separately prohibits "retaliation" and "interference, coercion, or intimidation."  See 42 U.S.C. § 12203(a) (retaliation); 42 U.S.C. § 12203(b) (interference, coercion or intimidation).  The Tenth Circuit, however, analyzes both types of claims in the same manner.  Compare EEOC v. C.R. England, Inc., 644 F.3d 1028, 1051 (10th Cir. 2011) (Section 12203(a)) with Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001) (Section 12203 (b));[22] see also Martin v. AT&T Corp., 331 F. Supp.2d 1274, 1301 n.6 (D. Colo. 2004) (Tenth Circuit law clear that Sections 12203(a) and (b) analyzed the same).

To establish a prima facie case of retaliation or interference, plaintiff must show that (1) she engaged in an activity protected by the ADA, (2) a reasonable employee would have found the challenged actions materially adverse and (3) a causal connection existed between the protected activity

----

[22]     To establish a prima facie case of retaliation under Section 12203(a), plaintiff must demonstrate that (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have found the challenged action materially adverse and (3) a causal connection existed between the protected activity and the materially adverse action."  644 F.3d at 1051.  To establish a prima facie case under Section 12203(b), plaintiff must show that (1) she engaged in an activity protected by the ADA, (2) she was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity and (3) a causal connection exists between the protected activity and the adverse action.  248 F.3d at 1264.

Although plaintiff notes that Sections 12203(a) and (b) provide separate causes of action, she treats the two as one under the same standard.  She asserts the same protected opposition and adverse action with respect to both claims.  The Court therefore considers them together.

and adverse action.  C.R. England, 644 F.3d at 1051; Selenke, 248 F.3d at 1264.[23]  Defendant challenges the second and third elements of plaintiff's claims.  The Court therefore assumes that plaintiff's request for accommodation and her request for reconsideration of defendant's determination constitute protected activity.[24]

A materially adverse employment action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination.  See Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010); Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007).  The Tenth Circuit liberally construes the phrase "adverse employment action" and does not limit it to "monetary losses in the form of wages or benefits," although a "mere inconvenience or alteration of job responsibilities will not suffice."  Reinhardt, 595 F.3d at 1133; Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004).  It also takes a "case-by-case approach" to claims of adverse action.  See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998).  The purpose is to separate actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts or their employers, from "petty slights, minor annoyances, and simple lack of good manners," which do not create such deterrence.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1216 (10th Cir. 2010).

Plaintiff may establish a causal connection between her protected activity and defendant's materially adverse employment action by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  C.R. England, 644

---

[23]    As noted, the McDonnell Douglas framework governs the Court's analysis.

[24]    Plaintiff initially requested an accommodation in early 2008, i.e. before March 13, 2008, and she requested reconsideration on January 20, 2009.  In her response to defendant's motion, plaintiff identifies no other protected activities.

F.3d at 1051.  If the adverse employment action was not "very closely connected in time to the protected

activity . . . plaintiff must rely on additional evidence beyond temporal proximity to establish causation."

Id.; Piercy v. Maketa, 480 F.3d 1192, 1198 (10th Cir. 2007); Anderson v. Coors Brewing Co., 181 F.3d

1171, 1179 (10th Cir. 1999).   Obviously, no causal connection exists if the adverse action occurred

before plaintiff's protected activity.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1234-

35 (10th Cir. 2000).

Plaintiff argues that defendant took numerous material adverse employment actions against her

as follows:  (1) it refused to provide plaintiff information and materials required to evaluate her

condition: (2) it demanded that plaintiff describe her health condition and impairments in detail – even

though it already had her medical information; (3) it conducted the accommodation checklist meeting

in an intimidating manner; (4) it refused to pay plaintiff for attending the meeting; (5) it did not tell

plaintiff about open positions which she might have been eligible to fill; (6) to settle her workers'

compensation claim, Liberty Mutual attempted to have plaintiff resign and enter into a full waiver and

release of all claims against defendant; (7) defendant falsely accused plaintiff of stealing shipping

supplies; (8) defendant placed plaintiff's picture on a "wall of shame" at the Parsons facility, falsely

accused plaintiff of faking her injury and forced plaintiff to perform demeaning work during her TAW;

(9) defendant gave plaintiff false information about her pension; (10) defendant provided inaccurate and

untimely information regarding the denial of accommodation; and (11) defendant denied plaintiff's

requests for accommodation.

### A.    Withholding Information And Materials Necessary To Evaluate Plaintiff's Condition

Defendant argues that the record does not support plaintiff's assertion that it refused to provide

information or materials required to evaluate plaintiff's condition.  In support of her assertion, plaintiff

cites additional material facts ("AMF") 36 and 39.  Doc. #79 at 27-28.  AMF 36 states that "UPS has admittedly failed to comply with its ADA policies and procedures in connection with Plaintiff's accommodation requests."  Id. at 27.  AMF 39 states that "UPS has admittedly failed to provide Plaintiff with information UPS claims is required in order for the company to evaluate Plaintiff's accommodation requests."  Id. at 28.

In support of these statements, plaintiff cites her deposition, her EEOC charge and the deposition of Toomsen, defendant's West Region Occupational Health Manager.[25]  Plaintiff's EEOC charge stated that Sloan withheld "paperwork UPS claims is required to consider and evaluate [an accommodation] request."  Doc. #79, Ex. 3 at 3.  Plaintiff does not identify what information or materials defendant withheld.[26]  Moreover, her EEOC charge stated that she ultimately received the appropriate information and materials and submitted an accommodation request.  Id.  Indeed, the record shows that plaintiff requested an accommodation in early 2008, Pl. Depo. at 149, that in early February of 2008 defendant and the Teamsters Union Local 795 (which represented plaintiff) agreed that plaintiff would go through

---

[25]    Only plaintiff's EEOC charge contains evidence relevant to whether defendant withheld information and materials necessary to evaluate plaintiff's condition.

Plaintiff cites her own testimony that Sloan did not send her a packet of jobs that plaintiff "could potentially be qualified for."  Pl. Depo. at 169.  Plaintiff does not explain how this packet of information related to defendant's evaluation of her condition.  This evidence relates more directly to plaintiff's fifth asserted adverse employment action, i.e. that defendant did not tell plaintiff about open positions which she might have been eligible to fill.

Plaintiff cites Toomsen's testimony that plaintiff "is not a qualified individual with a disability as there are not jobs currently available for her within her limitations/restrictions."  Doc. #79, Ex. 22 at 148-49.  She also refers to Toomsen's testimony that the copy of plaintiff's accommodation checklist which plaintiff's counsel presented to Toomsen at her deposition did not constitute the final completed checklist form.  Id. at 216.  Toomsen's testimony is not relevant to whether defendant withheld materials and information necessary to evaluate plaintiff's condition.

[26]    As already noted, plaintiff testified that Sloan did not send her a packet of information regarding jobs plaintiff might be qualified for, but this information is not relevant to whether defendant withheld information or materials necessary for it to evaluate plaintiff's condition.

defendant's ADA accommodation process, see Doc. #73, Ex. RR; Ferguson Decl. ¶ 31, and that in early February of 2008, defendant sent plaintiff paperwork to begin the accommodation process, Doc. #73, Ex. SS. Therefore, the record conclusively refutes plaintiff's contention that defendant retaliated or intimidated her by withholding materials and information necessary to evaluate her condition.

### B.     Requiring Plaintiff To Describe Her Health Condition

Without citation to the record, plaintiff argues that even though it already had her medical information, defendant intimidated her or retaliated by requiring her to describe her health condition and impairments in detail. Again without any citation to the record, footnote 12 of plaintiff's response to defendant's motion asserts that defendant knew every detail of plaintiff's physical and medical condition through an online database called RISKTRAC. Doc. #79 at 47 n.12. Even if defendant could have accessed plaintiff's medical records, plaintiff does not raise a genuine issue of material fact whether requiring her to describe her injury and her restrictions as part of a process to determine whether an accommodation was possible would dissuade a reasonable employee from filing a request for accommodation.

### C.     Accommodation Check-List Meeting

In May of 2009, defendant asked plaintiff to attend the accommodation checklist meeting with five human resources representatives she had never met, in a small room, without a lawyer or union representative present. At the meeting, the representatives refused to discuss possible accommodations or answer plaintiff's questions or assist her in any way. The record does not raise a genuine issue of material fact, however, whether such circumstances would dissuade a reasonable employee from pursuing a charge of discrimination. Turrentine v. United Parcel Serv., Inc., 645 F. Supp.2d 976, 991 (D. Kan. 2009) (no materially adverse action where defendant forced plaintiff to attend meeting with

various management personnel in which defendant's representative raised his voice and referenced plaintiff's "stupid lawyer"); see Somoza v. Univ. of Denver, 513 F.3d 1206, 1214-15 (10th Cir. 2008) (no material adverse action where defendant's representatives laughed, rolled their and snickered at plaintiffs during meeting); Mickelson v. N.Y. Life Ins. Co., 460 F. 3d 1304, 1309, 1318 (10th Cir. 2006) (no materially adverse action based on meeting with three members of management in which supervisor became "extremely angry").

### D.    Payment For Accommodation Checklist Meeting

Defendant asked plaintiff to attend a meeting on May 4, 2009 to discuss possible accommodations for plaintiff.  Defendant did not pay plaintiff for attending the one-hour-long meeting. Plaintiff asserts that defendant's refusal to pay her constitutes an adverse employment action.  She provides no evidence, however, that she was entitled to payment for the meeting.  Without more, defendant's refusal to pay plaintiff for the accommodation checklist meeting does not raise a genuine issue of material fact as to adverse employment action.  See Amro v. Boeing Co., 232 F.3d 790, 799 (10th Cir. 2000) (plaintiff's unhappiness with evaluations and salary increase not adverse employment action because plaintiff had not shown that performance merited higher ranking).

### E.    Notification Of Open Positions Which Plaintiff Could Perform With Or Without Accommodation

Defendant never notified plaintiff of open positions that she might be qualified to perform with or without accommodation.  Plaintiff argues that this constitutes a materially adverse employment action, but she has not shown that any such positions ever existed.  Defendant's failure to notify plaintiff of non-existent positions does not constitute adverse employment action.

### F.    Liberty Mutual Settlement Offer

Plaintiff testified that on two occasions Liberty Mutual offered to settle her workers'

-30-

compensation claim in return for resignation and waiver of all claims against defendant.  The record does not reflect that defendant asked Liberty Mutual to contact plaintiff or was in any way involved in the settlement offers.  Even if a reasonable jury could infer that defendant had a hand in the settlement offer, the record does not suggest that the action would dissuade a reasonable worker from making or supporting a charge of discrimination.  Moreover, plaintiff did not testify as to when Liberty Mutual contacted her, so she has failed to show a causal connection between her protected activity and the offer of settlement.  See Pl. Depo. at 249-51.

### G.    Theft Of Shipping Supplies

In August of 2009, a part-time supervisor, Rebecca McClenning notified Center Supervisor, Stephanie Cunningham, that plaintiff had taken packing tape from the Parsons facility while on leave. McDaniel Depo. at 20.  Defendant's Loss Prevention Department investigated McClenning's report but the evidence was inconclusive.  McDaniel Depo. 16-21.  Defendant did not discipline plaintiff as a result of McClenning's report or its investigation and it never terminated plaintiff's employment.  Id.; Pl. Depo. at 276.  As a matter of law, defendant's investigation of McClenning's report does not constitute an adverse employment action.  See Sarkar v. McCallin, 636 F.3d 572, 577 (10th Cir. 2011) (accusing plaintiff of stealing laptop and asking Colorado Bureau of Investigation to investigate not adverse action because nothing in record suggested that accusation was based on retaliatory animus as opposed to good faith belief that plaintiff stole laptop); Monaco v. Quest Diagnostics, Inc., No. 08-2500-KHV, 2010 WL 3843622, at *14 (D. Kan. Sept. 24, 2010) (reasonable jury could not find that investigation was adverse action where defendant had reasonable basis to investigate, defendant did not take action against plaintiff and plaintiff knew about investigation).

**H.      Accusation Of Faking Injury, Demeaning TAW And Wall Of Shame**

Riddle accused plaintiff of falsifying her injury, assigned plaintiff to demeaning TAW and was involved in posting plaintiff's picture on the "wall of shame" at the Parsons facility.  Even assuming that these actions were materially adverse, they occurred in November of 2006 – before plaintiff's request for accommodation.  Therefore, as a matter of law, the record shows no causal connection between these actions and plaintiff's protected activity.  See Kendrick, 220 F.3d at 1234-35.[27]

**I.      False Information Regarding Pension Benefits**

Plaintiff asserts that defendant gave her false information regarding pension benefits.  In support, plaintiff cites AMF 14, which states that "[a]fter permanent restrictions were placed on her in 2007, UPS allowed Plaintiff to return to work for one (1) hour."  Doc. #79 at 25.  AMF 14 cites plaintiff's testimony that Robinson arranged for plaintiff to go back to work for one hour in January of 2000 to help plaintiff qualify for retirement benefits.  Pl. Depo. at 169-70.  This testimony does not support plaintiff's assertion that she received false information about pension benefits.

Plaintiff testified that defendant denied her retirement benefits until she turned 65, but that she did not know who made decisions about her pension benefits or when they were made.  Plaintiff spoke with two of defendant's representatives who told her that she was qualified to receive pension benefits

---

[27]      Plaintiff argues that under Plotke v. White, 405 F.3d 1092, 1106-07 (10th Cir. 2005), the Court may consider evidence of retaliatory motive which took occurred before plaintiff filed her request for accommodation.  Doc. #79 at 49 n.15.  In the context of discriminatory termination Plotke states that "[p]laintiffs are not precluded from introducing 'quite probative evidence of earlier acts of discrimination to support a claim of current discriminatory intent,' even if prior events are beyond the limitations period."  Plotke, 405 F.3d at 1106-07.  By citing Plotke, plaintiff attempts to eliminate the third prong of her prima facie retaliation case – causation.  In Plotke, the Court was addressing what evidence is probative of discriminatory animus in the context of a wrongful discharge claim – not a retaliation claim.  By definition, a retaliatory adverse employment action must occur after plaintiff's protected activity.  Kendrick, 220 F.3d at 1234-35.

and would receive them, but a third representative told plaintiff that she did not qualify for the pension. Pl. Depo. at 266. Plaintiff has produced no evidence that she was entitled to pension benefits at the time she stopped working. Indeed, plaintiff testified that she was not entitled to pension benefits and stated the same in her application for Social Security disability benefits. Id. at 267; Doc. #76, Ex. BB.

Because plaintiff conceded that she is not entitled to pension benefits, defendant's decision to withhold them is not an adverse employment action. Any statement by defendant's representatives that plaintiff was entitled to such benefits would not dissuade a reasonable worker from making or supporting a charge of discrimination. Moreover, the record does not reflect when defendant gave plaintiff the misleading information about her pension benefits, so she has failed to establish a prima facie case of causal connection. See Pl. Depo. at 168-70; 266-67.

**J.    Inadequate And Untimely Information Regarding Denial Of Accommodation**

Plaintiff argues that defendant's denial of her accommodation requests were inaccurate and untimely, and as such they constitute materially adverse employment actions. By e-mail on June 22, 2009, Toomsen instructed Rosner to advise plaintiff that defendant believed she was not a qualified individual with a disability under the ADA. Doc. #73, Ex. GGG. Instead, June 23, 2009, Rosner sent plaintiff a letter which stated that defendant was unable to conclude she was disabled under the ADA. Id., Ex. HHH. On February 8, 2011, Ferguson sent plaintiff a letter which acknowledged that Rosner had sent plaintiff the wrong form letter and attached a revised letter which stated that defendant was not aware of any available position which plaintiff was qualified to perform with or without reasonable accommodation. Id. at 2.

Defendant admits that Rosner sent plaintiff the wrong form letter, and the record indicates that it was an accident – even though the letter stated that plaintiff was not disabled, defendant treated

plaintiff as though she were disabled and engaged plaintiff to determine whether reasonable accommodation could enable her to perform the essential functions of a reassignment position. Plaintiff does not believe defendant's explanation, but offers no evidence that defendant used the erroneous letter to retaliate against her. Therefore, plaintiff has not shown a genuine issue of material fact exists as to whether the erroneous letter would dissuade a reasonable employee from requesting accommodation.

Even if the erroneous letter constituted a materially adverse employment action, defendant has asserted a legitimate nondiscriminatory reason for the letter – it was an accident. Plaintiff has not responded with specific facts which suggest otherwise. Mere speculation cannot create a genuine issue of material fact. Sims v. Halliburton Co., 185 F.3d 875 (Table), 1999 WL 495629, at *14 (10th Cir. 1999) (citing Conaway v. Smith, 853 F.2d 789, 793 (10th Cir. 1988)). Moreover, as noted above, the record contradicts plaintiff's conclusory speculation that something nefarious was at play when Rosner sent the wrong letter.

### K.   Denial Of Plaintiff's Request For Accommodation

In early 2008, plaintiff asked to return to work with an accommodation. On March 13, 2008, defendant denied plaintiff's request. Based on the information from plaintiff's doctor, defendant was unable to find that plaintiff was "disabled" under the ADA. Accordingly, defendant concluded that plaintiff was ineligible for reasonable accommodation. Assuming that this decision constitutes a materially adverse employment action which is causally linked to plaintiff's request for accommodation, plaintiff has not shown that defendant's explanation for its decision is pretextual.[28]

---

[28]     The Court questions whether such a claim exists. Plaintiff claims that defendant retaliated against her for filing a request for accommodation by denying her request. It seems that such a claim would be subsumed into plaintiff's claim for wrongful denial of accommodation. Even if such a claim exists, the Court concludes that it does not survive summary judgment here.

Defendant has stated a legitimate nondiscriminatory reason for its decision – based on the law and information which was available at the time, plaintiff was not disabled under the ADA. The burden now reverts to plaintiff to establish a genuine issue of material fact that defendant's reason is pretext for retaliation. Plaintiff can show pretext by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan, 108 F.3d at 1323. "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Id; see also Kendrick, 220 F.3d at 1230. Evidence of pretext may include prior treatment of plaintiff, the employer's policies and practices, disturbing procedural irregularities and the use of subjective criteria. Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.1999), cert. denied, 528 U.S. 815 (1999). Mere conjecture that defendant's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. Morgan, 108 F.3d at 1323.

Here, plaintiff recites a long list of pretext evidence, none of which directly addresses whether defendant's reason for concluding that plaintiff was not "disabled" was false or unworthy of belief. Toomsen and Folino decided that plaintiff was not disabled under the ADA before the ADA Amendments Act of 2008 lowered the bar on the disability inquiry and based on Dr. Jones' responses to a request for medical information. In February of 2008, Dr. Jones stated that plaintiff was unable to perform all of the functions of her job, but that her condition did not substantially limit major life activities other than working. Plaintiff states in conclusory fashion that she was disabled under pre-ADA Amendment Act law, but she points to no specific law or evidence to support her position. The

question is not whether the decision by Toomsen and Folino was wise, fair or correct, but whether they honestly believed those reasons and acted in good faith upon those beliefs.  Rivera v. City & Cnty. of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004).  Plaintiff points to no evidence that they acted in bad faith or were motivated by retaliatory animus.[29]  Plaintiff has not met her burden of showing a genuine issue of material fact whether defendant's reason for denying her request for accommodation was retaliatory or intimidating.

> **L.    Denial Of Plaintiff's Request For Reconsideration**

In January of 2009, plaintiff asked defendant to reconsider its decision denying her request for accommodation.  Following a meeting with plaintiff on May 4, 2009, Toomsen and Folino determined that although plaintiff might be disabled under the ADA, she was not a "qualified individual" under the ADA because she did not qualify for any position at the Parsons facility with or without accommodation.  On June 23, 2009, Rosner erroneously sent plaintiff a letter which erroneously denied plaintiff's request because she was not disabled.  On February 8, 2011, Ferguson sent plaintiff a letter which stated that defendant had mistakenly sent the wrong form letter.  Ferguson attached a revised letter which stated that defendant was not aware of any available position which plaintiff could perform with or without accommodation.

Again, the Court assumes that defendant's decision that plaintiff was not a qualified individual under the ADA was a materially adverse employment decision and that it was causally linked to plaintiff's request for reconsideration.  Defendant has stated a legitimate nondiscriminatory reason for

---

[29]    Plaintiff argues that defendant denied her request for accommodation as part of an unlawful "100% healed" policy.  She cites numerous EEOC actions and other litigation from across the country, but she provides no evidence that Toomsen and Folino ever applied the unlawful policy.  Indeed, the fact that defendant allowed plaintiff to return to work with accommodation in 2006 directly contradicts her conclusory assertion that she was a victim of the "100%" policy.

its decision – that plaintiff was not a qualified individual with a disability under the ADA because she could not perform the essential functions of her position or any available position at the Parsons facility with or without reasonable accommodation.  The burden therefore shifts to plaintiff to point to specific evidence that defendant's proffered reason is pretext for retaliation.

Again, plaintiff recites a long list of pretext evidence, which, as noted above, is not probative of whether Toomsen and Folino acted in good faith or were motivated by retaliatory animus.  Plaintiff also argues that the erroneous letter is evidence of pretext.  By itself, the letter might raise a genuine issue of material fact whether Toomsen and Folino acted in bad faith given the change in the law and the additional medical information which they reviewed before making their decision.  The record reflects that the letter was an accident, though, and that Toomsen and Folino had actually decided that plaintiff may have been disabled but that she was unable to perform the essential functions of any job at the Parsons facility with or without accommodation.  See Doc. #73, Ex. GGG.

As noted above, plaintiff's speculation that the letter of June 23, 2009 accurately represented Toomsen and Folino's bad-faith conclusion that plaintiff was not disabled does not create a genuine issue of material fact.  Sims, 185 F.3d 875 (Table), 1999 WL 495629, at *14 (citing Conaway, 853 F.2d at 793).  Moreover, the record reflects that defendant treated plaintiff as though she were disabled and engaged plaintiff to try to find a reasonable accommodation for her.  Toomsen and Folino reached their decision only after this process.  Obviously, defendant could have been more careful, but the fact that Rosner sent plaintiff the wrong letter does not raise a genuine issue of material fact whether defendant's stated reason for denying plaintiff's request, i.e. that plaintiff could not perform the essential functions of her job or any available job at the Parsons plant with or without reasonable accommodation, was pretextual.

For the reasons stated above, no genuine issue of material fact remains for trial with respect to plaintiff's retaliation claim under the ADA.  The Court therefore sustains defendant's motion for summary judgment on plaintiff's retaliation and coercion, intimidation or interference claims under the ADA.

## III.    Workers' Compensation Retaliation

To establish a prima facie case that defendant discharged plaintiff in retaliation for filing a workers' compensation claim, plaintiff must demonstrate that (1) she filed a claim for workers' compensation benefits or sustained a work-related injury for which she could assert a future claim for benefits; (2) defendant knew of her claim or injury; (3) defendant terminated plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination. Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1116 (10th Cir. 2001); Bracken v. Dixon Indus., Inc., 272 Kan. 1272, 1275, 38 P.3d 679, 682 (2002).  Although defendant has not terminated plaintiff's employment, it assumes that its denial of plaintiff's requests for accommodation and decision to not let plaintiff return to work satisfy the termination of employment element of plaintiff's prima facie case. See Doc. #69 at 50-52.

Defendant challenges only the fourth element, i.e. the causal connection between plaintiff's workers' compensation claim which she filed some time in 2006 and defendant's denial of her requests for accommodation in early 2008 and 2009.  Defendant also argues that it has stated legitimate nondiscriminatory reasons for its employment decisions and that plaintiff has not created a genuine issue of material fact that those reasons are pretexts for retaliation.

To establish a prima facie case, plaintiff must show that a causal connection existed between her workers' compensation claim and defendant's decisions not to let her return to work.  Plaintiff may

show a causal connection by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. See Proctor, 502 F.3d at 1212 (citing Rebarchek, 272 Kan. at 554-55, 35 P.3d at 899); Pendergraft v. Layne Christensen Canada, Ltd., 446 F. Supp.2d 1214, 1218 (D. Kan. 2006). Unless defendant's termination of plaintiff's employment is very closely connected in time to the protected conduct, plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation. Rebarchek, 272 Kan. at 554-55, 35 P.3d at 899 (citing Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999); Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996)). For example, plaintiff may show that defendant engaged in a pattern of retaliatory conduct stretching from the time when plaintiff filed her workers' compensation claim to defendant's termination of her employment. Id. A one and one-half month period between protected activity and adverse action may, by itself, satisfy the causation requirement of plaintiff's prima facie case. See Anderson, 181 F.3d at 1179 (citing Ramirez v. Okla. Dept. Of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994)). A three-month period standing alone, however, is insufficient. Id. (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)).

Here, it is unclear exactly when plaintiff filed her workers' compensation claim. She first notified Liberty Mutual of her injury on February 1, 2006 and she received workers' compensation benefits through October 1, 2007. Defendant first denied plaintiff's request for accommodation on March 13, 2008 and denied her request for reconsideration on June 23, 2009. More than five months passed between the time when plaintiff stopped receiving workers' compensation benefits and when defendant first denied her request for accommodation. The temporal gap between the time when plaintiff filed her workers' compensation claim and defendant's decision was necessarily longer. Therefore, the temporal proximity between plaintiff's workers' compensation claim and defendant's

denial of her request for accommodation is insufficient to satisfy the causation element of plaintiff's prima facie case.

In addition to temporal proximity, plaintiff relies on a series of actions which she suggests constitutes a pattern of retaliation beginning shortly after her injury and culminating in defendant's denial of her request for accommodation.[30]  Specifically, in November of 2006, shortly after plaintiff's injury, Riddle accused her of falsifying her injury, forced plaintiff to perform demeaning work as part of her TAW and plaintiff's name appeared on the "wall of shame" at the Parsons facility.  Assuming that a reasonable jury could conclude that these incidents constitute retaliatory conduct, the pattern ended in November of 2006 – more than one year before defendant denied plaintiff's request for accommodation.  Plaintiff also argues that defendant retaliated by accusing her of stealing shipping supplies.  As previously noted, the fact that defendant investigated an independent claim that plaintiff had stolen shipping supplies does not create a genuine issue of material fact of retaliation.

Because the pattern of retaliation which plaintiff asserts does not connect her workers' compensation filing to defendant's denial of her request for accommodation, plaintiff has not raised a genuine issue of material fact whether a causal connection exists between the two events.  The Court therefore grants defendant summary judgment on plaintiff's workers' compensation retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #68) filed June 6, 2011 be and hereby is **SUSTAINED**.

---

[30]     Plaintiff cites Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006) for the proposition that "protected activity that is followed very closely in time by retaliatory conduct, standing alone, is sufficient to justify an inference of retaliatory motive."  Haynes involved Title VII, ADEA and ADA claims though – not retaliatory discharge claims under Kansas law.  The operative "adverse action" for purposes of plaintiff's workers' compensation retaliation claim under Kansas law is termination (or, in this case, defendant's denial of plaintiff's request to return to work with accommodation).

Dated this 13th day of September, 2011 at Kansas City, Kansas.

s/  Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge